765 So.2d 861 (2000)
Lee Ellis PETERSON, Appellant,
v.
STATE of Florida, Appellee.
No. 5D99-1925.
District Court of Appeal of Florida, Fifth District.
August 18, 2000.
*862 James B. Gibson, Public Defender, and Barbara C. Davis, Assistant Public Defender, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Belle B. Schumann, Assistant Attorney General, Daytona Beach, for Appellee.
W. SHARP, J.
Lee Peterson appeals from his conviction for the statutory offense of aggravated manslaughter of an elderly or disabled person, in connection with the death of his 82-year-old mother. Section 782.07(2), Florida Statutes, declares that a person who causes the death of an elderly or disabled person by culpable negligence, under circumstances set forth in section 825.102(3), commits aggravated manslaughter. Neglect of an elderly or disabled person is defined by section 825.102(3) as:
(a)1. A caregiver's failure or omission to provide an elderly person or disabled adult with the care, supervision, and services necessary to maintain the elderly person's or disabled adult's physical and mental health, including, but not limited to, food, nutrition, clothing, shelter, supervision, medicine, and medical services that a prudent person would consider essential for the wellbeing of the elderly person or disabled adult; or
2. A caregiver's failure to make a reasonable effort to protect an elderly person or disabled adult from abuse, neglect, or exploitation by another person.
Neglect of an elderly person or disabled adult may be based on repeated conduct or on a single incident or omission that results in, or could reasonably be expected to result in, serious physical or psychological injury, or a substantial risk of death, to an elderly person or disabled adult.
The statute also includes two lesser offenses:
(b) A person who willfully or by culpable negligence neglects an elderly person or disabled adult and in so doing causes great bodily harm, permanent disability, or permanent disfigurement *863 to the elderly person or disabled adult commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
(c) A person who willfully or by culpable negligence neglects an elderly person or disabled adult without causing great bodily harm, permanent disability, or permanent disfigurement to the elderly person or disabled adult commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
We affirm.
Peterson's primary argument on appeal is that he bears no criminal liability in this case for the death of his mother because he never assumed any of her actual, physical care taking, and thus under the statute, he was not her "caregiver." The statute defines "caregiver" as:
`Caregiver' means a person who has been entrusted with or has assumed responsibility for the care or the property of an elderly person or disabled adult. `Caregiver' includes, but is not limited to relatives, court-appointed or voluntary guardians, adult household members, neighbors, health care providers, and employees and volunteers of facilities as defined in subsection (7).
§ 825.101(2), Fla. Stat.
We think the evidence in this case was sufficient to establish a breach of duty owed by Peterson under the statute, as a "caregiver," as well as under the common law. The facts in this case are as egregious as those described by Justice Lewis in Sieniarecki v. State, 756 So.2d 68 (Fla. 2000), and the courts in People v. Simester, 287 Ill.App.3d 420, 222 Ill.Dec. 838, 678 N.E.2d 710 (1997) and Davis v. Commonwealth of Virginia, 230 Va. 201, 335 S.E.2d 375 (1985). An elderly, disabled and helpless person is left alone, awash in his or her own human wastes, with resulting bed sores so extensive and severe as to have culminated in life-threatening sepsis, and there is additional evidence that the person was malnourished to the point of starvation, and severely dehydrated, while occupying a room in a house where another adult family member, or members, reside. The result of the culpable neglect is death. A moral duty was clearly breached by the adult family members living in the house where the elderly person suffered such abject neglect, we all agree. But we also think a legal duty was breached, as those three cases concluded.[1]
In this case, two brothers, James and Lee Peterson (the appellant) shared a home with their mother (the deceased) for nineteen years. The house was owned jointly by Lee and his mother. Lee worked very long hours, and it was agreed between the brothers that James would do the physical cleaning, feeding, bed-changing, etc., for their mother. She suffered from Alzheimer's disease, and was cranky and hard to deal with. They also agreed that James would receive his mother's social security checks, deposit them in a joint account with himself and his mother, and from that account, pay all of the household expenses for the three of them, including the mortgage payment on the house.
During the last six months of Mrs. Peterson's life, she was not doing well. For the last two months, as Lee described her, all she could do was sit on the edge of her bed and try to read the newspaper, or look at the pictures. She was bedridden the last two weeks prior to her death. Lee testified he visited her almost every day, or evening when he got home.
According to the medical experts, Mrs. Peterson was probably immobilized in bed during the last two weeks of her life because she was severely constipated, due to dehydration. She had not had a bowel *864 movement for two weeks prior to her death. This condition led to impaction of her colon, and its eventual rupture, which caused deadly peritonitis. She must have been in extreme pain. The colon ruptured at least two or three days before James called 911 and Mrs. Peterson was taken to the hospital. By then, she had less than a one percent chance to survive.
The police officers and the paramedics who went to the Petersons' home testified as to the horrendous condition of Mrs. Peterson's living circumstances. It was very hot in her room, there was no air conditioning, and no windows were open. The odor in the house and, in particular in her room from human waste, made them ill. The carpet was stained with human waste and feces. The mattress was soaked through with urine, sagging almost to the floor. Mrs. Peterson had been lying in a deep indentation in the mattress contaminated with urine and feces. This had caused her bed sores to reach an extreme state of ulceration. At trial, medical experts testified it would have taken several weeks for bed sores to have become as extensive and severe as hers were, at the time of her death.
Lee argues that he, as opposed to James,[2] could not be found to have violated section 825.102(3) because he took no active role with regard to his mother's care, and thus was not a "caregiver." This is too narrow an interpretation of the term "caregiver." "Caregiver" logically encompasses more than just the person or persons who do the actual physical work of caring for an elderly or disabled adult. It also reaches those who in fact are "entrusted" with the responsibility for seeing that an elderly or disabled adult is being cared for in a proper and humane manner.
The facts in this case established that Mrs. Peterson was a completely helpless, disabled elderly person, in the custody of her two sons. They also were in fact entrusted with her property (her social security income and her house). They agreed between themselves that James would do the actual work of caring for her. That did not excuse Lee from the duty of overseeing James' care. The jury had a basis to conclude James was culpably negligent, and in turn, Lee must have known about it.
People v. Simester is factually close to this case. There the husband of a niece who had undertaken to care for her elderly uncle in their household, was held criminally liable for the uncle's death, when the uncle died due to starvation and dehydration suffered in their home. The niece in that case, had, as James did in this case, done the physical labor (such as it was) in caring for the uncle. The statute in Illinois is worded differently than the Florida statute in this case, but in our view, they mean the same thing.
The Illinois statute defines "caregiver" as one who has a duty to provide for an elderly person's health and personal care at the person's place of residence, including relatives who reside in the same residence.[3] The Illinois court held that the husband was a caregiver because he resided in the same household as the deceased, *865 whether he undertook the physical labor of taking care of the uncle. Although the court did not elaborate on whether the husband had a caretaking duty, it assumed he did. The Florida statute has truly parallel provisions. A caregiver is defined as one "entrusted with ... the care or property of an elderly, or disabled person," and the term includes "adult household members."
Sieniarecki has less relevance to Lee's liability in this case. Sieniarecki upheld the criminal liability of a daughter, who like James, had assumed actual physical care of her disabled mother, who was living in her household. It did not deal with the duty or criminal liability under the statute of another adult member of the household.
However, the court speculated about whether a common law duty exists, pre-dating the statutory one imposed by section 825.102(3). In footnote two on page nine of its opinion, the court infers that such duties do exist by citing with approval Personal Representative of Estate of Starling v. Fisherman's Pier, Inc., 401 So.2d 1136 (Fla. 4th DCA 1981), rev. denied, 411 So.2d 381 (Fla.1981). That case held that a property owner may have a duty to take some minimal steps to safeguard an invitee on his premises from extreme danger, even where the invitee through his own negligence, has allowed himself to be exposed to that danger in the first place. In this case, Lee Peterson, as part owner of the premises where the deceased suffered gross neglect, had a duty to safeguard his mother from the dreadful living conditions she was forced to endure, in their home.
Sieniarecki also cited People v. Oliver, 210 Cal.App.3d 138, 258 Cal.Rptr. 138 (1989). That case imposed criminal liability on a young woman who took a stranger to her home who later became helpless from a heroin overdose, because she failed to seek medical aid for him. That case was based on an assumed "special relationship." See Restatement (Second) of Torts § 324 (1965). In our view, both James and Lee assumed this special relationship with their mother, due to their joint living arrangements and her complete inability to care for herself.
In Davis, the Virginia Supreme Court upheld the criminal liability of a daughter for the death of her elderly, completely disabled mother caused by her daughter's neglect. The deceased died of starvation, dehydration, and being subjected to cold temperatures. Her room had no heat. There was no statutory basis in Virginia upon which the court could rely to impose a duty of care. The defendant argued she had no legal duty to care for her mother. However, the court found a common law duty, based on the evidence in the case that the daughter had accepted the responsibility for the care of her mother. Very similar to the facts in this case, it was clear in Davis that the mother was completely disabled and helpless to care for herself, the mother allowed the daughter to live in her home, and she shared with the daughter her social security income and food stamps. The court concluded:
Davis was more than a mere volunteer; she had a legal duty, not merely a moral one, to care for her mother.
335 S.E.2d at 378.
We conclude that Lee Peterson (jointly with his brother James) had a legal duty, under the circumstances of this case, be it via common law or section 825.102(3), to care for his mother, himself, or to obtain care for her from others, and to make reasonable efforts to protect her from the abuse and neglect she suffered under the "care" of James.
AFFIRMED.
THOMPSON, C.J., concurs.
COBB, J., dissents with opinion.
COBB, J., dissenting.
The central point on appeal concerns whether under section 825.101(2), Florida *866 Statutes, the defendant was a "caregiver" and thus subject to criminal prosecution for neglecting the needs of his 82 year old mother.
The defendant and his brother James (who is not a party to this appeal) were each charged with and convicted of aggravated manslaughter of an elderly or disabled person following the death of their mother Alice. The three had lived together for many years. The evidence at trial was that when medical assistance was finally summoned for Alice (who had previously made it clear she did not like doctors), she was found to be living in filthy conditions which seriously compromised her health and which in fact ultimately led to her death.
The defendant and his brother were charged with violating section 782.07(2), Florida Statutes, which provides:
A person who causes the death of any elderly person or disabled adult by culpable negligence under s. 825.102(3) commits aggravated manslaughter of an elderly person or disabled adult, a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
Section 825.102(3), Florida Statutes, provides:
(3)(a) "Neglect of an elderly person or disabled adult" means:
1. A caregiver's failure or omission to provide an elderly person or disabled adult with the care, supervision, and services necessary to maintain the elderly person's or disabled adult's physical and mental health, including, but not limited to, food, nutrition, clothing, shelter, supervision, medicine, and medical services that a prudent person would consider essential for the well-being of the elderly person or disabled adult; or
2. A caregiver's failure to make a reasonable effort to protect an elderly person or disabled adult from abuse, neglect, or exploitation by another person. Neglect of an elderly person or disabled adult may be based on repeated conduct or on a single incident or omission that results in, or could reasonably be expected to result in, serious physical or psychological injury, or a substantial risk of death, to an elderly person or disabled adult.
(b) A person who willfully or by culpable negligence neglects an elderly person or disabled adult and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to the elderly person or disabled adult commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
(c) A person who willfully or by culpable negligence neglects an elderly person or disabled adult without causing great bodily harm, permanent disability, or permanent disfigurement to the elderly person or disabled adult commits a felony of the third degree, punishable as provided in s. 775.082, 775.083, or s. 775.084.
(Emphasis added).
The term "caregiver" is defined in section 825.101(2), Florida Statutes, as follows:
"Caregiver" means a person who has been entrusted with or has assumed responsibility for the care or the property of an elderly person or disabled adult. "Caregiver" includes, but is not limited to relatives, court-appointed or voluntary guardians, adult household members, neighbors, health care providers, and employees and volunteers of facilities as defined in subsection (7).
Under this statutory scheme invoked by the prosecutor, a "caregiver" is subject to criminal penalties where the "caregiver" neglects the needs of an elderly person or disabled adult either willfully or by culpable negligence. Under Florida law, the failure to act where one has a legal duty to act may constitute culpable negligence. See e.g., Leet v. State, 595 So.2d 959 (Fla. 2d DCA 1991)(failure to protect child from *867 abuse despite clear indications that child was being abused subjected defendant to criminal sanctions under section 827.04(1), Florida Statutes).
The defendant, in moving for a judgment of acquittal, argued that he was not a "caregiver" because he was neither entrusted with nor assumed any responsibility for his mother's care. The defendant points to uncontradicted evidence that James agreed to assume responsibility for the care of their mother and that the defendant was not involved in his mother's care. The defendant argues that his mere presence in the home did not make him a "caregiver." He asserts that the statutory scheme does not punish mere presence or wholly passive conduct.
In Sieniarecki v. State, 756 So.2d 68 (Fla.2000), the supreme court approved the Fourth District Court of Appeal decision in Sieniarecki v. State, 724 So.2d 626 (Fla. 4th DCA 1998), which sustained the defendant's conviction under section 825.102(3) and upheld the constitutionality of that section. In particular, the defendant in Sieniarecki had asserted that section 825.102(3) was unconstitutionally vague and violated due process by imposing an affirmative duty upon an adult child to care for her elderly mother. The evidence in Sieniarecki was that it had been agreed among the family that the defendant would assume the care for her debilitated mother and the mother moved in with her daughter. The daughter then failed to adequately address her mother's basic needs and the mother died under circumstances somewhat similar to those found in the instant case. In addressing the issue of the duty of the petitioner/defendant daughter to her debilitated mother, the supreme court explained:
Petitioner asserts that section 825.102(3) creates an affirmative duty "to provide care, supervision, or services to another person" not recognized at common law. In this case, petitioner who assumed responsibility for the day-to-day care of her disabled motherwas in a unique position to assist her mother and to make other potential sources of assistance aware of her mother's needs. Cf. Estate of Starling v. Fisherman's Pier, Inc., 401 So.2d 1136, 1137-38 (Fla. 4th DCA), review denied, 411 So.2d 381 (Fla.1981)(holding that a proprietor may have a duty to "take some minimal steps to safeguard" an invitee upon his premises from extreme danger, even where the invitee, through his own negligence, illness, injury or drunkenness "has allowed himself to be exposed to that danger in the first place"); People v. Oliver, 210 Cal.App.3d 138, 258 Cal.Rptr. 138, 144 (1989)(recognizing in affirming Oliver's conviction for involuntary manslaughter based upon her failure to seek medical aid for the victim, a man she had met at a bar and brought to her home, who died of a heroin overdosea duty to act arising from a special relationship [derived in part from Restatement (Second) of Torts § 324 (1965), providing that "[o]ne who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by ... the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge"] created when Oliver took the victim "from a public place where others might have taken care to prevent him from injuring himself, to a private placeher homewhere she alone could provide such are"). But cf. Neveils v. State, 145 So.2d 883, 884 (Fla. 1st DCA 1962)(holding that Neveils, who failed to "aid or otherwise be concerned with the safety of his wife" during the intervening period between the time when he first discovered her lying on the floor and four hours later, when he called an ambulance, was not guilty of manslaughter based upon culpable negligence). Regardless of whether the subject legislation created a new duty, or codified an existing common law duty, with respect to the acts and omissions of *868 an adult child who assumes the day-to-day care of a disabled parent living in the same household, it is clear the Legislature now intends to provide liability for such caretaker's culpable negligence resulting in neglect of the disabled adult. Cf. Eversley v. State, 748 So.2d 963 (Fla.1999)(observing that, "by making a specific reference to the child abuse statute, it is clear that the Legislature now intends to include the failure to provide medical care within the definition of manslaughter," and had the amended statutes "been in effect at the time of the alleged crime in this case, Eversley's conduct [in failing to obtain needed medical care for her infant son] would have been punishable as manslaughter," but holding that, because the alleged crime took place prior to the effective date of the amendments, the finding in Bradley v. State, 79 Fla. 651, 84 So. 677 (1920), that a parent's failure to provide needed medical care for his child does not rise to the level of culpable negligence required for the manslaughter statute "controls, and the trial court was correct in granting the motion for judgment of acquittal as to the manslaughter charge"). (Emphasis added).
756 So.2d at 73, n. 2.
The supreme court's discussion seems consistent with the Fourth District's dictum that the statutes at issue "do not punish mere presence, or wholly passive conduct, but rather penalize the failure of a person to provide basic food, shelter, clothing and medical needs, only where he or she has assumed such a duty." 724 So.2d at 627 (emphasis added). Indeed, under the common law there existed no obligation on adult children to care for their aging parents. See People v. Heitzman, 9 Cal.4th 189, 37 Cal.Rptr.2d 236, 886 P.2d 1229 (1994). The Florida statutory scheme does not create a per se duty of care on the part of adult children toward their elderly parents. It rather is designed to criminalize the conduct of those who have assumed such a duty and breached said duty willfully or through culpable negligence.
In the instant case, unlike the situation in Sieniarecki, no evidence was presented that by express agreement the defendant was entrusted with responsibility for his elderly mother's care or that he assumed responsibility for her care.[1] Certainly he did nothing toward her care. The state points out that the defendant lived with his mother for many years under an arrangement whereby he lived off her income (which was used to make the monthly mortgage payment). The state argues this evidence establishes an implied contract whereby the defendant accepted the benefit of his mother's income and in exchange owed her a duty of care. Under this argument, however, an adult child who accepts largesse from his or her elderly or disabled parent would automatically become a "caregiver" and owe a legal duty to care for such parent. Suffice it to say we deal here with a criminal statute which must be strictly, not expansively, construed. See State v. Jackson, 526 So.2d 58 (Fla.1988).
The state additionally argues that the defendant could not abdicate legal responsibility for his infirm mother's care by simply ignoring her needs. The state analogizes this to the duties owed by a parent to a minor child, see Nicholson v. State, 600 So.2d 1101 (Fla.1992), but such a relationship involves a legally recognized duty of care going back to the common law. This court should decline the state's invitation to create, under the criminal code, a legal duty of care on the part of an adult child toward his or her infirm parents. *869 That is a legislative task infused with public policy considerations, not a judicial task. Likewise, any anomaly in permitting prosecution of one who undertakes to care for an infirm adult but breaches said duty while omitting prosecution of one who simply ignores the needs of such a person is properly brought to the attention of the legislature.
The state relies on Leet v. State, 595 So.2d 959 (Fla. 2d DCA 1991) wherein the Second District held that a jury could properly determine that the defendant had a legal duty under section 827.04(1), Florida Statutes to protect his girlfriend's child from the girlfriend's acts of abuse and that his failure to do so constituted culpable negligence. Section 827.04(1) provided:

Whoever, willfully or by culpable negligence, deprives a child of, or allows a child to be deprived of, necessary food, clothing, shelter, or medical treatment, or who, knowingly or by culpable negligence, inflicts or permits the infliction of physical or mental injury to the child, and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to such child, shall be guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. (Emphasis added).
The evidence established that the defendant allowed his girlfriend and her one year old son to move into his home on a permanent basis and that the defendant cared for the child at times. There was clear evidence that the girlfriend abused her son and that the defendant did nothing. Leet is predicated on section 827.04(1) which by use of the word "whoever" includes within its coverage anyone, not just a parent, who knowingly or by culpable negligence, permits the infliction of physical or mental injury to a child. That statutory language is much broader than the definition of "caregiver" adopted by the legislature in section 825.101(2).
The majority's reliance on statutes criminalizing animal cruelty[2] and animal abandonment[3] is likewise misplaced as those statutes criminalize such conduct by any person who commits the proscribed acts. Nor is reliance on People v. Simester, 287 Ill.App.3d 420, 222 Ill.Dec. 838, 678 N.E.2d 710 (1997) appropriate. In Simester a husband and wife were successfully prosecuted for criminal neglect of an elderly person. The husband testified that his wife was responsible for the care of her uncle and that he had no responsibility for the uncle's care. The three lived together in the same house. The definition of "caregiver" in Illinois included:
"a parent, spouse, adult child or other relative by blood or marriage who resides with or resides in the same building with and regularly visits the elderly or disabled person, knows or reasonably should know of such person's physical or mental impairment and knows or reasonably should know that such person is unable to adequately provide for his own health and personal care." 720 ILCS 5/12-21(b)(3)(A) (West 1994). (Emphasis added).
678 N.E.2d at 714. This is a far more expansive definition of the term than that found in section 825.101(2), Florida Statutes.
Finally, the state's alternate argument is that under section 825.102(3)(a)2, neglect of an elderly person or disabled adult includes a caregiver's failure to make a reasonable effort to protect said person from abuse, neglect or exploitation by another person. The state's position is that even assuming arguendo that the defendant was not responsible for his mother's care, he still had a statutory duty to protect his mother from neglect or mistreatment by James. However, once again, this statutory duty is placed upon a "caregiver." The defendant was not a "caregiver." Criminal liability can only be imposed for the failure *870 to act where a legally recognized duty to act exists. See Leet. No such duty existed here under the statutes invoked by the prosecutor and the defendant's motion for judgment of acquittal should have been granted.
I would reverse.
NOTES
[1] Indeed, if no legal duty exists in this case or the three cases cited above, the law extends less concern and protection for disabled or elderly adults than there is for cats and dogs, a truly anomalous situation. See § 828.12, Fla. Stat.; Wilkerson v. State, 401 So.2d 1110 (Fla.1981); C.E. America, Inc. v. Antinori, 210 So.2d 443 (Fla.1968).
[2] James was convicted of aggravated manslaughter in a joint trial with Lee, but he did not appeal.
[3] § 12.21. Criminal neglect of an elderly or disabled person.

(3) `Caregiver' means a person who has a duty to provide for an elderly or disabled person's health and personal care, at such person's place or residence, including but not limited to, food and nutrition, shelter, hygiene, prescribed medication and medical care and treatment.
`Caregiver' shall include:
(A) a parent, spouse, adult child or other relative by blood or marriage who resides with or resides in the same building with and regularly visits the elderly or disabled person, knows or reasonably should know of such person's physical or mental impairment and knows or reasonably should know that such person is unable to adequately provide for his own health and personal care.
[1] The only evidence available to the state's case in this regard was testimony by a detective that James said that occasionally the defendant would help out. At trial, however, James testified this statement was inaccurate, that the defendant was not directly involved in his mother's care. The prior inconsistent statement, standing alone, was insufficient as a matter of law to establish guilt beyond a reasonable doubt. See State v. Green, 667 So.2d 756 (Fla.1995).
[2] § 828.12, Fla. Stat.
[3] § 828.13, Fla. Stat.